UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARTIN B. NOVICK, JR.,

Plaintiff,

v.

VILLAGE OF WAPPINGERS FALLS, NEW
YORK,

Defendant.

No. 17-CV-7937 (KMK)

OPINION & ORDER

Appearances:

Jane B. Gould, Esq.
Gould & Berg LLP
White Plains, NY

Howard M. Miller, Esq.
Bond, Schoeneck & King, PLLC
Garden City, NY

KENNETH M. KARAS, District Judge:

Plaintiff Martin B. Novick, Jr. ("Plaintiff") brings this action against the Village of

Wappinger Falls, New York (the "Village" or "Defendant"), pursuant to 42 U.S.C. § 1983,

alleging that Defendant retaliated against him in violation of the First Amendment because he

engaged in Union-related activities, and discriminated against him in the terms and conditions of

employment on the basis of disability in violation of the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12101 *et seq.*, and the New York State Human Rights Law ("NYSHRL"),

N.Y. Exec. Law § 296. (*See* Compl. (Dkt. No. 1).) Before the Court is Defendant's Motion To

Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Not. of Mot. (Dkt. No. 17).). For

the following reasons, Defendant's Motion is granted in part and denied in part.

<u>I.  Background</u>

<u>A.  Factual Background</u>

The facts recounted below are taken from Plaintiff's Complaint and are assumed to be true for purposes of resolving the Motion.

Defendant is a municipal corporation incorporated in the State of New York.  (Compl. ¶ 12.)  Plaintiff has been employed as a law enforcement officer for the Village since August 1989 and has permanent competitive civil service status in that position.  (*Id.* ¶ 9.)  In October 2001, Plaintiff was promoted to the title of Detective and received an increase in pay over the pay he received as a police officer.  (*Id.* ¶ 10.)

Since approximately 1994, Plaintiff has served as President of the Police Benevolent Association ("PBA") of Wappingers Falls, the exclusive bargaining agent for a unit consisting of all full-time and part-time police officers in the Village, with the exception of the Chief of Police and the Village Police Commissioner, Carl Calabrese ("Calabrese"), who works part-time.  (*Id.* ¶ 13.)  The PBA and the Village are parties to a Collective Bargaining Agreement ("CBA") for the period January 1, 2006 through December 1, 2013, as modified by a Memorandum of Agreement ("MOA") covering the period January 1, 2013 through December 31, 2018.  (*Id.* ¶ 14.)

In his role as Union President, Plaintiff has actively advocated with the Village on behalf of the PBA and its members.  (*Id.* ¶ 15.)  Plaintiff alleges that Village officials, including Calabrese, "have frequently exhibited, in word and in deed, antipathy to that advocacy."  (*Id.* ¶ 16.)  For example, on April 28, 2014, Plaintiff, along with PBA Vice President Scott McHugh ("McHugh"), who was also a Detective, advocated on behalf of the PBA to the Village Police Committee that Calabrese was causing scheduling problems within the Village Police

Department.  (*Id*. ¶ 17.)  There was at that time a long-standing practice within the department that Detectives prepared their work schedules.  (*Id*. ¶ 18.)  Plaintiff alleges that in retaliation for the foregoing advocacy, on April 29, 2014, the very next day, Calabrese issued an order prohibiting Plaintiff, McHugh, and two other detectives, from preparing their work schedules. (*Id*. ¶ 19.)

In May 2014, Calabrese told one or more PBA members that he would bankrupt the PBA.  (*Id*. ¶ 20.)  At some point in the Fall of 2014, Plaintiff, McHugh and another part-time police officer met with Calabrese to advocate for the PBA by setting forth demands for CBA negotiations.  (*Id*. ¶ 21.)  Shortly thereafter, Calabrese stated to the others who attended that meeting that he was going to "get Novick."  (*Id*. ¶ 22.)

In June 2015, Plaintiff was diagnosed with bladder cancer.  (*Id*. ¶ 23.)  He advised Calabrese, as well as Police Sergeant Burke ("Burke") and Police Lieutenant Birdsell ("Birdsell") of that diagnosis in July 2015.  (*Id*. ¶ 24.)  In or about July 2015, Plaintiff advised Calabrese that he was going to go through a series of treatments and that it would last six weeks. (*Id*. ¶ 25.)  In the Summer of 2015, Plaintiff explained to Calabrese, Burke, and Birdsell how the treatment known as "BCG" worked, specifically that the treatment was administered by being injected directly into the bladder, and that he did not know how he was going to feel after the treatment.  (*Id*. ¶ 26.)

In or about July 2015, Plaintiff took time off from work for his cancer treatment.  (*Id*. ¶ 27.)  During the course of his first round of treatment, Plaintiff explained to Calabrese the effects of the treatment, including that he was very uncomfortable, and that he experienced urgency to go to the bathroom without real warning.  (*Id*. ¶ 28.)  In addition, in July 2015, Plaintiff advised Village Mayor Matt Alexander that he had bladder cancer and that the medical

plan was to have six weeks of treatment and three years of periodic treatments or "preventive maintenance." (*Id*. ¶ 29.)

Plaintiff learned in October 2015 that the first round of treatment was not effective and he advised Calabrese and Burke that he would be going to Sloan Kettering in New York City for a second opinion. (Compl. ¶ 30.) Plaintiff was required to undergo a second round of treatment commencing in November 2015. (*Id*. ¶ 31.) He informed Calabrese, Birdsell, and Burke of the second round of treatment. (*Id*.)

During the second course of treatment, Plaintiff was out of work for a number of days and presented a note to his superiors on December 16, 2015 to the effect that he was required to be out of work. (*Id*. ¶ 32.) In January 2016, Plaintiff returned to work but continued to suffer the side effects of treatment, including urgency and frequency of urination and fatigue. (*Id*. ¶ 33.)

During the period described above, Plaintiff was assigned to the Detective Bureau, and notwithstanding the side effects of treatment, he was able to manage his caseload as a Detective without restrictions. (*Id*. ¶ 34.) Plaintiff alleges that during this time, his supervisors were aware of the side effects he suffered as a result of the cancer treatment. (*Id*. ¶ 35.)

In February 2016, in his role as PBA President, Plaintiff engaged in CBA negotiations with Calabrese who demanded that the new CBA contain language whereby new hires would be required to commit to remaining employed with the Village for five years before seeking new employment. (*Id*. ¶ 36.) Plaintiff advocated against the insertion of such language because he believed that it was in the interest of the PBA members to be able to better themselves by seeking other employment. (*Id*. ¶ 37.)

In March 2016, Police Commissioner Calabrese intentionally falsely told one of the Village's full-time police officers that the PBA did not want the Village to employ full-time

police officers, that the PBA does not represent that officers' interests, that he should not trust the PBA or its leadership, and that he should look out for himself because the PBA would not do so.  (*Id*. ¶ 38.)

During the period between March 30 and April 13, 2016, Plaintiff underwent three weeks of additional cancer treatment.  (*Id*. ¶ 39.)  As a result of those treatments, Plaintiff again suffered side effects of urgency of urination, irritability, and fatigue.  (*Id*. ¶ 40.)  Plaintiff's supervisors, including Calabrese, Birdsell, and Burke were aware that Plaintiff was suffering those side effects.  (*Id*. ¶ 41.)  During this period, Plaintiff was assigned to the Detective Bureau and had easy access to bathroom facilities.  (*Id*. ¶ 42.)

On April 27, 2016, all three Detectives in the Detective Bureau, including Plaintiff and McHugh, were notified that as of June 1, 2016, they would be reassigned from the Detective Bureau to patrol and that all Detective functions and work they had exclusively performed and which had been exclusively performed by part-time police officers in the PBA's unit, would be transferred and performed by the Dutchess County Sheriff's Office and/or New York State Police, except that the Village detectives would assist the State Police in homicide investigations.  (*Id*. ¶ 43.)  On June 1, 2016, all three Detectives in the Detective Bureau, including Plaintiff, were reassigned to uniform patrol.  (*Id*. ¶ 44.)

While assigned to the Detective Bureau, Plaintiff had not been required to wear a uniform.  (*Id*. ¶ 45.)  Also, while assigned to the Detective Bureau, Plaintiff and the Detectives planned their own schedules, put in their schedules weekly, and were able to change their schedules and manage their schedules around their caseloads.  (*Id*. ¶ 48.)  On patrol, Plaintiff and the other Detectives reassigned to patrol were required to put in their schedules monthly and were required to work an eight-hour tour.  (*Id*. ¶ 49.)

Upon inquiry as to the reasons for this reassignment, Plaintiff was advised that the reasons were budgetary. (Compl. ¶ 46.) Plaintiff alleges that the Village budget was not in fact reduced by reason of the reassignment. (*Id.* ¶ 47.)

On July 8, 2016, while Plaintiff continued to serve as President of the PBA, the PBA filed an Improper Practice Charge against the Village of Wappingers Falls with New York State Public Employment Relations Board, alleging numerous violations of law. (*Id.* ¶ 50.)

Plaintiff was scheduled to work on Monday, July 25, 2016 and Thursday, July 28, 2016.[1] (*Id.* ¶ 51.) On July 24, 2016, Plaintiff called Police Headquarters and on a recorded call stated "I'm not coming in this week because [of] my treatment. I told the Lieutenant that I was going to try to at least do my Monday shift, but I got to go for my treatment again this week." (*Id.* ¶ 52.) He further stated, "[a]nd with my treatment I got to just stay close to the house . . . I tried but I just can't make it." "I don't want to be put in a bad position." (*Id.*) The dispatcher on duty responded, "All right, Marty, you got it." (*Id.* ¶ 53.) On July 24, 2016, per departmental procedure and practice, Plaintiff also called the on-call Lieutenant Birdsell at 6:02 p.m., but Birdsell did not answer the call or call back. (*Id.* ¶ 54.) At 6:03 p.m. on July 24, 2016, Plaintiff again called Birdsell who did not answer the phone or call back. (*Id.* ¶ 55.) However, Plaintiff left a recorded message and stated, "I just wanted to call you up and let you know I won't be able to make it tomorrow (July 25, 2016) either. I'm still hurting over this. I'm going to keep trying

---

[1] The Court notes that the Complaint states Plaintiff was scheduled to work on July 25, *2017* and July 28, *2017*. (Compl. ¶ 51 (emphasis added).) The Complaint also states that Calabrese directed Plaintiff to provide written explanation of his absence, and that Plaintiff provided this explanation on July 30, *2017*. (*Id.* ¶ 60–61 (emphasis added).) Given that all other events related to Plaintiff's absences from work are alleged to have occurred in July and August 2016, and that events subsequent to his absences occurred in late 2016, (*see id.* ¶¶ 50, 52, 54, 56, 64), the Court takes the July 2017 dates to be typos and reads Plaintiff's Complaint as alleging that Plaintiff was scheduled to work on July 25, 2016 and July 28, 2016, and that he communicated with Calabrese about his absence on July 30, 2016.

to call you.  I did let the desk know that I wouldn't [be] able to be in.  But I'll keep trying to call you.  Bye."  (Compl. ¶ 55.)  At 7:25 p.m. on July 24, 2016, Plaintiff again called Birdsell who again did not answer the phone or call back.  (*Id*. ¶ 56.)  After following departmental procedure by calling the on-call supervisor three times without reaching him, Plaintiff called his immediate supervisor, Police Sergeant Burke and informed him he would not be reporting for work for the upcoming week, specifically the midnight shifts of Monday, July 25 and Thursday, July 28, to which Burke responded in substance that he "would take [care] of it."  (*Id*. ¶ 57.)  Burke was aware that Plaintiff received treatment on Wednesdays, and that he was unable to work Thursdays as a result.  (*Id*. ¶ 58.)

Plaintiff thus did not report to work on July 25 or July 28, 2016.  (*Id*. ¶ 59.)  Calabrese subsequently directed Plaintiff to provide a written explanation of his absence on July 28, 2016, claiming that his absence was "unauthorized."  (*Id*. ¶ 60.)  Plaintiff complied with Calabrese's directive and provided a written explanation on July 30, 2016.  (*Id*. ¶ 61.)  In that explanation, Plaintiff stated that he was required to periodically undergo treatment for bladder cancer, that he began treatment two weeks prior, and that it had caused him discomfort.  (*Id.*)  He advised that he had explained the treatment to Birdsell who stated it was not a problem.  (*Id*. ¶ 62.)  He advised Calabrese that he would be unable to work during the week following treatment and would provide a note when he returned.  (*Id.*)  On August 1, 2016, Calabrese claimed that he was unaware that Plaintiff was having maintenance treatment for cancer.  (*Id*. ¶ 63.)

On August 10, 2016, Plaintiff and his counsel met with Calabrese and others regarding Calabrese's purported investigation of Plaintiff's July 28, 2016 allegedly unauthorized absence and to mediate a resolution of his absence before filing "potential charges."  (*Id*. ¶ 64.)  Plaintiff

provided Calabrese a doctor's note dated August 10, 2016 stating that Plaintiff required an accommodation at work in that he required frequent bathroom breaks.  (*Id*. ¶ 65.)

By letter dated September 6, 2016, Calabrese served and filed a Notice of Discipline against Plaintiff alleging misconduct based upon the allegedly unauthorized absence of July 28, 2016 and allegedly insubordinate statements made by Plaintiff during the August 10, 2016 meeting.  (Compl. ¶ 66.)  Hearings on the Notice of Discipline began on October 10, 2016 and continued over nine sessions, the last of which was held on January 10, 2017.  (*Id*. ¶ 68.)

On September 6, 2016, Plaintiff filed a Complaint of discrimination in the terms and conditions of employment on the basis of disability with the New York State Division of Human Rights against the Village and the Village Police Department.  (*Id*. ¶¶ 6, 67.)  At that time, Plaintiff also filed a complaint alleging violations of the ADA with the United States Equal Employment Opportunity Commission ("EEOC").  (*Id*. ¶ 6.)

On October 25, 2016, in response to the August 10, 2016, request for an accommodation, the Village's counsel advised Plaintiff that inasmuch as the Village is of "significantly limited size," Plaintiff could take as many bathroom breaks as he wanted" while working patrol.  (*Id*. ¶ 69.)  Plaintiff and/or his representatives informed the Village that this was an insufficient accommodation because if Plaintiff were on the road or involved in an in investigation, he might be unable to get to a bathroom in sufficient time to meet his needs, and that the accommodation requested was to work inside at headquarters.  (*Id*. ¶ 70.)  The requested accommodation was repeatedly denied.  (*Id*. ¶ 71.)

On March 9, 2017, the New York State Division of Human Rights found that probable cause existed that Defendants engaged in or are engaging in the unlawfully discriminatory practice alleged by Plaintiff.  (*Id*. ¶ 7.)

On May 19, 2017, the Hearing Officer designated to hear evidence on the September 6, 2016 disciplinary charges found Plaintiff responsible on each of the three charges put forth by the Village attorney, and recommended the penalty of demotion. (Compl. ¶ 72.) Plaintiff was instructed to report to Police headquarters to receive a new identification card and badge reflecting this demotion. (*Id*. ¶ 73.) To date, as a result of the Village's failure to accommodate Plaintiff's request to work in headquarters as he had previously done when he was a Detective, he has been unable to return to work. (*Id*. ¶ 78.)

On July 28, 2017, the EEOC issued Plaintiff a Notice of Right to Sue on his claims of discrimination on the basis of disability. (*Id*. ¶ 8.)

Plaintiff alleges that other officers, including a Lieutenant of the Wappingers Falls Police Department, have been absent from work without authorization. (*Id*. ¶ 74.) Those other officers were not Union officers and did not engage in advocacy on behalf of Union members, (*id*. ¶ 75), and did not have a disability as defined by federal or state law, (*id*. ¶ 76). Plaintiff alleges that no such other officer was ever served with a Notice of Discipline, brought up on charges, or demoted as a result of being absent without authorized leave. (*Id*. ¶ 77.)

Plaintiff alleges he is and was able to perform the essential functions of his previously assigned position of Police Detective and his current assignment to patrol, with or without an accommodation. (*Id*. ¶ 89.)

B.  Procedural Background

Plaintiff filed his Complaint on October 16, 2017. (Compl. (Dkt. No. 1).) On November 28, 2017, the Court granted Defendant an extension to answer or otherwise respond to the Complaint. (Dkt. No. 8.)

On December 15, 2017, counsel for Defendant submitted a pre-motion letter to the Court requesting permission to file a Motion To Dismiss. (*See* Letter from Howard Miller, Esq., to Court (Dkt. No. 9).) On December 18, 2017, the Court granted Plaintiff's request for an extension to reply to Defendant's letter. (Dkt. No. 11.) On January 8, 2018, counsel for Plaintiff submitted a letter opposing Defendant's request for a pre-motion conference. (*See* Letter from Jane Gould, Esq., to Court (Dkt. No. 12).)

On February 15, 2018, the Court held a pre-motion conference, (*see* Dkt. (minute entry for Feb. 15, 2018)), and set a briefing schedule, (Dkt. No. 14). On March 27, 2018, the Court granted Defendant an extension to submit its Motion to Dismiss. (Dkt. No. 16.)

On April 5, 2018, Defendant filed the instant Motion To Dismiss and accompanying papers. (Not. of Mot.; Aff. of Howard Miller, Esq. ("Miller Aff.") (Dkt. No. 18); Def.'s Mem. of Law in Supp. of Mot. To Dismiss ("Def.'s Mem.") (Dkt. No. 19).) On May 7, 2018, Plaintiff filed his Opposition to Defendant's Motion to Dismiss. (*See* Pl.'s Mem. of Law in Opp'n to Mot. To Dismiss ("Pl.'s Mem.") (Dkt. No. 21).) Defendant filed its Reply in Further Support of their Motion To Dismiss on May 18, 2018. (*See* Def.'s Mem. of Law in Further Supp. of Mot. To Dismiss ("Def.'s Reply") (Dkt. No. 22).)

## II.  Discussion

### A.  Standard of Review

Defendant moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering Defendant's Motion To Dismiss, the Court is required to "accept as true all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). And, the Court must "draw[] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot.*

*Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted). "To go beyond the allegations in the [c]omplaint would convert the . . . motion to dismiss into one for summary judgment . . . ." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002). There are a few notable exceptions to this rule. In addition to the Complaint, a court ruling on a Rule 12(b)(6) motion "may consider . . . any written instrument attached to the complaint as an exhibit[,] or any statements or documents incorporated in it by reference," as well as "matters of which judicial notice may be taken, and documents either in [the] plaintiffs' possession or of which [the] plaintiffs had knowledge and relied on in bringing suit." *Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.,* 742 F.3d 42, 44 n.1 (2d Cir. 2014) (alterations and quotation marks omitted); *Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

B.  First Amendment Retaliation

Plaintiff alleges that Defendants retaliated against him for engaging in Union activities by bringing disciplinary charges against him, demoting him, and refusing him reasonable workplace accommodations requested on account of his disability. (Compl. ¶¶ 79–83.) Defendant argues that Plaintiff's claim fails because his union-related speech was not made as a private citizen and was not of public concern and therefore not protected. (Def.'s Mem. 10–14.)

"To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [the plaintiff's] exercise of that right; and (3) the defendant's actions caused him some injury." *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

Determining whether a public employee's speech is protected "encompasses two separate subquestions: (1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke as a citizen rather than solely as an employee." *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (ultimately citing *Garcetti v. Ceballos*, 547 U.S. 410, 420–22 (2006)). "If the answer to either question is no, that is the end of the matter." *Id.* "To demonstrate a causal connection a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action." *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (citation and quotation marks omitted). "A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Id.* (citing *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004)). Plaintiff must also show that Defendants took an adverse employment action against him that would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Wrobel v. County of Erie*, 692 F.3d 22, 31 (2d Cir. 2012) (citation and quotation marks omitted).

## 1. Protected Speech—Speaking as a Private Citizen

The Second Circuit has identified "two relevant inquiries to determine whether a public employee speaks as a citizen: (1) whether the speech fall[s] outside of the employee's official responsibilities, and (2) whether a civilian analogue [(*i.e.*, a form or channel of discourse available to non-employee citizens)] exist[s]." *Montero v. City of Yonkers,* 890 F.3d 386, 397

(2d Cir. 2018) (citation, some alterations, and quotations marks omitted).  While the second issue "may be of some help in determining whether one spoke as a citizen," it is not dispositive—the first inquiry is the critical one.  *Id.* at 397–98.  "[S]peech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer."  *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 203 (2d Cir. 2010).  "Ultimately, the question . . . is whether the employee's speech was part-and-parcel of [that person's] concerns about his ability to properly execute his duties."  *Montero*, 890 F.3d at 398 (citation and quotation marks omitted).

In the present case, Plaintiff alleges three instances of speech.  First, on April 28, 2014, Plaintiff and McHugh advocated on behalf of the PBA, to the Village Police Committee, that Commissioner Calabrese was causing scheduling problems within the Village Police Department.  (Compl. ¶ 17.)  Second, at some point in the Fall of 2014, Plaintiff, McHugh, and another part-time police officer met with Calabrese to advocate for the PBA by setting forth demands for CBA negotiations.  (*Id.* ¶ 21.)  Third, in February 2016, in his role as PBA President, Plaintiff engaged in CBA negotiations with Calabrese to oppose proposed contract language requiring a five-year commitment to the Police Department by new hires.  (*Id.* ¶¶ 36–37.)  Plaintiff advocated against this provision because he believed that it was in the interest of PBA members to be able to better themselves by seeking other employment.  (*Id.* ¶ 37.)

In a recent analogous case, the Second Circuit concluded that a city police officer sufficiently pled that his remarks during union meetings criticizing the police commissioner's management of the police department were not "part-and-parcel" of his concerns about his ability to execute his duties, were not "undertaken in the course of performing his responsibilities

as a police officer," and were therefore made as a private citizen. *Montero*, 890 F.3d at 399. Although the Second Circuit in *Montero* declined "to decide categorically that when a person speaks in his capacity as a union member, he speaks as a private citizen," the court did note that plaintiff made his remarks in his role as union vice president—a role that he was "not required to serve" in as part of being a police officer. *Id.* at 398–99.

Here, like the plaintiff in *Montero*, Plaintiff was speaking as a union official. Nothing in Plaintiff's Complaint nor in Defendant's submissions suggests that raising issues about scheduling with the Village Police Committee, (Compl. ¶ 17), setting forth demands for CBA negotiations, (*id.* ¶ 21), or advocating against a particular hiring practice, (*id.* ¶¶ 36–37), all on behalf of the PBA and its members, were "part-and-parcel" of Plaintiff's concerns about his ability to execute his duties, or that these instances of speech were "undertaken in the course of performing his responsibilities as a police officer." *Montero*, 890 F.3d at 399. Plaintiff has admittedly failed to plead any facts that would allow the Court to conclude that there is a civilian analogue through which non-employee civilians can raise concerns with police department leadership, but, as the Second Circuit noted in *Montero*, "the lack of a civilian analogue [is] not critical to [deciding] . . . . whether [Plaintiff] spoke as a private citizen." *Id.* at 398. The Court concludes that Plaintiff has plausibly pled that he was speaking as a private citizen in all three instances. *See Raymond v. City of New York*, 317 F. Supp. 3d 746, 776–783 (S.D.N.Y. 2018) (holding that police officers' statements made through internal police department channels regarding the illegality of a quota system for law enforcement activity was not within the scope of a police officer's duties and was protected citizen speech made on a matter of public concern even though there was no civilian analogue); *see also Butts v. N.Y.C. Dep't of Educ.*, No. 16-CV-5504, 2018 WL 4725263, at *6 (E.D.N.Y. Sept. 28, 2018) (holding that paraprofessional

working with special education students spoke as a private citizen when she separately made statements to union representative and school administrator that a new school policy violated the education plans and rights of special education students because her job responsibilities "did not include commenting on the school administration's violation of its special-education students' rights," and her statements were thus "related, but not pursuant, to her duties"); *Stajic v. City of New York*, No. 16-CV-1258, 2018 WL 4636829, at *5–6, *17 (S.D.N.Y. Sept. 27, 2018) (holding that a forensic scientist who worked for the Office of the Chief Medical Examiner and served on the Commission on Forensic Science ("CFS"), and who made a series of statements during CFS executive sessions about hiring and firing decisions made by her supervisors, made those statements as a private citizen because, "[p]laintiff's role on the CFS was a separate and voluntary undertaking, akin to participation in a labor union or bar association").

## 2. Protected Speech—Speech Involving a Matter of Public Concern

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (citation and quotation marks omitted). "The inquiry turns on the 'content, form, and context' of the speech. *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)). "On the other hand, speech that principally focuses on an issue that is personal in nature and generally related to the speaker's own situation or that is calculated to redress personal grievances—even if touching on a matter of general importance—does not qualify for First Amendment protection." *Montero*, 890 F.3d at 399–400 (citations, quotation marks, and alterations omitted). "The speaker's motive is a factor to consider but is not

dispositive." *Golodner v. Berliner*, 770 F.3d 196, 202 (2d Cir. 2014) (citation and quotation marks omitted).[2]

In *Montero*, the Second Circuit also concluded that the plaintiff's remarks expressing his opposition to personnel cuts because they were bad for members of the PBA, bad for the community, and would endanger public safety, and calling for a no-confidence vote with respect to the Police Commissioner, each involved matters of public concern because they "plainly constituted speech on a matter of political, social, or other concern" to the community. 890 F.3d

---

[2] Defendants cite district court cases that predate *Montero* and do not apply the test for determining whether a public employee spoke as a private citizen on a matter of public concern as laid out by the Second Circuit in that case. (Def.'s Mem. 10–13 (citing *Payson v. Bd. of Educ. of Mt. Pleasant Cottage Sch.*, No. 14-CV-9696, 2017 WL 4221455, at *18 (S.D.N.Y. Sept. 20, 2017) (holding that the plaintiff's remarks about snow day policy were not on matter of public concern because they implicated internal union employment terms and conditions and she was not "speaking solely as a Union representative" but also for her own benefit); *Zane v. City of New York*, No. 11-CV-4961, 2014 WL 972032, at *4–7 (E.D.N.Y. Mar. 13, 2014) (holding that the plaintiff's speech about working conditions and alleged violations of union's CBA were not addressed to matters of public concern where the plaintiff spoke up in defense of fellow officer being assigned to field duty); *Green v. City of New York*, No. 06-CV-1836, 2009 WL 3319356, at *7–8 (E.D.N.Y. Oct. 14, 2009) (holding that the plaintiff's filing of grievances on behalf of other union members and stating to management that he planned to testify on behalf of other union members did not constitute speech touching on matters of public concern because the grievances at issue were filed about matters of personal interest); *Galligan v. Town of Manchester*, No. 01-CV-2092, 2003 WL 21146710, at *6 (D. Conn. May 19, 2003) (holding that employee's grievances against employer related to supervisor's conduct towards her and her need for an accommodation were not matters of public concern); *Quinn v. City of Johnstown*, No. 96-CV-136, 1998 WL 187404, at *4 (N.D.N.Y. Apr. 15, 1998) ("Because [the plaintiff's] statements concern department scheduling, promotions, and internal department politics, they do not touch on matters of public concern."). These cases often apply principles of law rejected by the Second Circuit in *Montero*, such as that the speaker has to be speaking "solely as a Union representative" in order for the speech to be protected, or that internal personnel matters, for example, could never be matters of public concern. Moreover, even if these cases applied the correct legal standard, they are factually distinguishable because they involve individual employees who filed individual grievances on behalf of themselves or others, and the union representatives who represent them. The instances of speech Plaintiff alleges here do not involve such personal grievances. Separately, Defendant also cites cases outside the Second Circuit that are not binding on this Court and not instructive in light of *Montero*. (Def.'s Mem. 10, 12 (citing *Van Compernolle v. City of Zeeland*, 241 F. App'x 244 (6th Cir. 2007); *Broderick v. Roache*, 751 F. Supp. 290 (D. Mass. 1990)).

17

at 400. The Second Circuit concluded that the plaintiff's remarks involved matters of public concern even though the plaintiff had a "personal rivalry" with the other union leader, because "an individual motivated by a personal grievance can simultaneously speak on a matter affecting the public at large." *Id*. (citation and quotation marks omitted)). Significantly, the court also made clear that previous Second Circuit "broad dicta" in *Clue v. Johnson*, 179 F.3d 57 (2d Cir. 1999), "that union activities criticizing management constitute matters of public concern," "has been walked back by . . . subsequent case law." *Montero*, 890 F.3d at 399; *accord Lynch v. Ackley*, 811 F.3d 569, 582 (2d Cir. 2016) ("Though the court [in *Clue*] said in dicta that 'retaliation solely for union activity clearly raises a public concern' . . . it obviously did not mean that all activities undertaken through a union necessarily become matters of public concern merely by virtue of their collateral connection to the union.").

With respect to Plaintiff's February 2016 speech opposing proposed contract language requiring a five-year commitment to the Police Department by new hires, Plaintiff alleges that he engaged in this speech because he believed that it was in the interest of the PBA members to be able to better themselves by seeking other employment. (Compl. ¶¶ 36–37.) The Court concludes that policies that touch on being able to effectively hire, retain, and ensure the future success of police officers are conceivably of some "concern to the community . . . and of value and concern to the public.'" *Lane*, 573 U.S. at 241; *see also Sugar v. Greenburgh Eleven Union Free Sch. Dist.*, No. 18-CV-67, 2018 WL 6830865, at *6–7 (D. Conn. Dec. 28, 2018) (holding that teacher's reporting student's misbehavior to law enforcement was on a matter of public concern because the student posed a danger to the teacher and others' safety); *Raymond*, 317 F. Supp. 3d at 776 (holding that police officers' statements made through internal police department channels regarding the illegality of a quota system for law enforcement activity involved a matter

of public concern); *Jackson v. City of New York*, No. 14-CV-5755, 2015 WL 5698535, at *4 (S.D.N.Y. Sept. 28, 2015) (holding that plaintiff who, in her capacity as an elected union chapter leader, expressed concerns about a school's rating to the school leadership team was speaking on a matter of public concern); *Pekowsky v. Yonkers Bd. of Educ.*, 23 F. Supp. 3d 269, 276–78 (S.D.N.Y. 2014) (holding that the plaintiff's advocacy on behalf of teachers' union regarding compensation for teachers' supervision of extracurricular activities was a matter of public concern, because "union representation of teachers is a matter of importance to the functioning of our public education system" (citations omitted)).

With respect to two of Plaintiff's three alleges instances of protected speech, specifically the April 28, 2014 complaint to the Village Police Committee that Commissioner Calabrese was causing scheduling problems within the Village Police Department, (Compl. ¶ 17), and the Fall 2014 setting forth of demands for CBA negotiations, (*id.* ¶ 21), Plaintiff's pleading admittedly lacks detail as to what the problems with the police schedules were and what the demands for the CBA negotiations were. However, accepting Plaintiff's allegations as true and drawing all reasonable inferences in his favor, it is plausible that scheduling issues within the Police Department and union activity or unrest within the Police Department, could conceivably relate to the operations of the Police Department, and would therefore be of "concern to the community." *Lane*, 573 U.S. at 241; *see also Ricciuti v. Gyzenis*, 832 F. Supp. 2d 147, 154–55 (D. Conn. 2011) (holding that officer's speech concerning police department supervisors' schedules and costs incurred by town as a result of avoidable inefficiencies involved a matter of public concern); *Shelton Police Union, Inc. v. Voccola*, 125 F. Supp. 2d 604, 627–28 (D. Conn. 2001) (holding that officer's speech concerning the general operations and management of the police department was on a matter of public concern); *cf. Jackler v. Byrne*, 658 F.3d 225, 236 (2d

Cir. 2011) (holding that exposure of official misconduct within a police department "is generally of "great consequence to the public").

The Court thus finds that Plaintiff has, albeit barely, plausibly alleged that he engaged in three instances of protected speech. Because Defendant raises no other bases warranting dismissal of Plaintiff's First Amendment retaliation claim, the Motion To Dismiss with respect to the retaliation claim concerning Plaintiff's February 2016 speech is denied.

C. Disability Claims

Plaintiff brings three claims under the ADA: (1) failure to accommodate; (2) discriminatory reassignment to patrol duty; and (3) discriminatory demotion. (Compl. ¶¶ 84–104.) The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Plaintiff also brings a NYSHRL disability discrimination claim. (Compl. ¶¶ 105–111.) The NYSHRL makes it unlawful for an employer to discriminate on the basis of, inter alia, disability, race, creed, color, or sexual orientation. *See* N.Y. Exec. Law § 296.

1. Failure to Accommodate

Plaintiff alleges he was denied reasonable accommodation when he was reassigned from the Detective Bureau to patrol, (Compl. ¶¶ 43–44), and his subsequent requests to work inside at Police headquarters were repeatedly denied, (*id*. ¶¶ 69–71). Defendant argues that Plaintiff's reasonable accommodation claim should be dismissed because he failed to exhaust his remedies under the ADA, (Def.'s Mem. 15), and he has failed to state a claim because the accommodation he requested was not reasonable, (*id*. at 16).

Defendant argues that Plaintiff failed to exhaust his remedies under the ADA with respect to his reasonable accommodation claim.  (Def.'s Mem. 15; Def.'s Reply 6–7.)  Defendant attaches a copy of Plaintiff's Verified Complaint before the New York State Division of Human Rights, (Miller Aff. Ex. B ("State Complaint")), and argues that Plaintiff did not allege failure to accommodate therein, (Def.'s Mem. 15).  Defendant also argues that Plaintiff's state charge is dated August 31, 2016, and the facts giving rise to his failure to accommodate claim did not occur until October 25, 2016, so that Plaintiff did not exhaust his remedies with respect to the later conduct.  (Def.'s Reply 7.)

Failure to exhaust is an affirmative defense, not a pleading requirement.  *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir. 2013).  Because defendants bear the burden of showing non-exhaustion, the "issue of exhaustion is generally not amenable to resolution by way of a motion to dismiss.  Rather, the defendants must present proof of non-exhaustion."  *Nicholson v. Murphy*, No. 02-CV-1815, 2003 WL 22909876, at *6 (D. Conn. June 16, 2003).  However, dismissal is appropriate on a motion to dismiss "if failure to exhaust is clear from the face of the complaint (and incorporated documents)."  *Gomez v. N.Y.C. Police Dep't*, 191 F. Supp. 3d 293, 299 (S.D.N.Y. 2016); *see also White v. Westchester County*, No. 18-CV-730, 2018 WL 6726555, at *6 (S.D.N.Y. Dec. 21, 2018) ("If failure to exhaust is apparent from the face of the complaint . . . a Rule 12(b)(6) motion is the proper vehicle." (citation and quotation marks omitted)).

Here, it is not clear from the face of the Complaint that Plaintiff failed to exhaust his administrative remedies under the ADA.  First, putting aside whether and to what extent the Court may consider the State Complaint at this stage, Plaintiff correctly points out that on page

six of that State Complaint, he did check the box under "Acts of Discrimination," that states

"Denied me an accommodation for my disability." (State Complaint 6.) Moreover, in his

Complaint, Plaintiff alleges that he filed a complaint alleging violations of the ADA with the

EEOC, (Compl. ¶ 6), and received a Notice of Right to Sue from the EEOC on July 28, 2017,

(*id.* ¶ 8). Plaintiff also alleges that on March 9, 2017, the New York State Division of Human

Rights found that probable cause existed that Defendant engaged in unlawfully discriminatory

practice. (*Id.* ¶ 7.) Defendant offers no proof that Plaintiff's March 9, 2017 notice from the New

York State Division of Human Rights did not encompass the October 2016 failure-to-

accommodate allegations. Defendant also fails to offer any proof that the Notice of Right to Sue

Plaintiff that alleges he received from the EEOC did not encompass all of Plaintiff's claims.

The Court therefore declines to dismiss Plaintiff's accommodation claim on exhaustion

grounds at this stage. Defendant remains free to raise the exhaustion issue in the future.

### b. Merits Analysis

"Discrimination in violation of the ADA includes, *inter alia*, 'not making reasonable

accommodations to the known physical or mental limitations of an otherwise qualified individual

with a disability.'" *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir.

2009) (quoting 42 U.S.C. § 12112(b)(5)(A)). Moreover, a "qualified individual" under the ADA

is "an individual who, with or without reasonable accommodation, can perform the essential

functions of the employment position that such individual holds or desires." 42 U.S.C.

§ 12111(8); *see also McBride*, 583 F.3d at 96. Accordingly, an ADA plaintiff can establish a

prima facie claim of disability discrimination based on the failure to accommodate a disability by

proving the following elements:

> (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an
> employer covered by the statute had notice of his disability; (3) with reasonable

accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

*McMillan v. City of New York*, 711 F.3d 120, 125–26 (2d Cir. 2013) (citation omitted). Once a plaintiff has established a prima facie case, the burden shifts to the defendant to show "(1) that making a reasonable accommodation would cause it hardship, and (2) that the hardship would be undue." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999) (citation omitted). Plaintiff must plead sufficient facts to raise the inference "that the failure was motivated by discriminatory intent." *Lyman v. City of New York*, No. 01-CV-3789, 2003 WL 22171518, at *6 (S.D.N.Y. Sept. 19, 2003) (citation and quotation marks omitted); *see also Logan v. Matveevskii*, 57 F. Supp. 3d 234, 258 (S.D.N.Y. 2014) ("[A] plaintiff is required to provide evidence that the delay was motivated by the employer's discriminatory intent, as opposed to mere negligence.").

Defendant argues that Plaintiff fails to state a reasonable accommodation claim because "a police department is not required to create a new desk position for a patrol officer" and requesting reassignment to a "desk job" is not a request for a "reasonable accommodation." (Def.'s Mem. 16.)

"On the issue of reasonable accommodation, the plaintiff bears only the burden of identifying an accommodation, the costs of which, facially, do not clearly exceed its benefits." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 139 (2d Cir. 1995); *see also McBride*, 583 F.3d at 97 n.3 (noting that "with regard to the reasonableness of a proposed accommodation, a plaintiff bears only a light burden of production that is satisfied if the costs of the accommodation do not on their face obviously exceed the benefits"). Once a plaintiff has identified a facially reasonable accommodation, the defendant bears the burden of "persuading the *factfinder* that the plaintiff's proposed accommodation is unreasonable." *Borkowski*, 63 F.3d

at 138 (emphasis added); *see also Mitchell*, 190 F.3d at 6 ("An employer can defeat a prima facie claim if it shows (1) that making a reasonable accommodation would cause it hardship, and (2) that the hardship would be undue.").  "The reasonableness of an employer's accommodation is a 'fact-specific' question that often must be resolved by a factfinder."  *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (citation omitted).

A reasonable accommodation is one that "enable[s] an individual with a disability who is qualified to perform the essential functions of that position . . . [or] to enjoy equal benefits and privileges of employment."  29 C.F.R. §§ 1630.2(o)(1)(ii), (iii).  "[R]easonable accommodation may include, *inter alia*, modification of job duties and schedules, alteration of the facilities in which a job is performed, acquisition of devices to assist the performance of job duties, and, under certain circumstances, 'reassignment to a vacant position.'"  *McBride*, 583 F.3d at 97 (quoting 42 U.S.C. § 12111(9)(B)).  "To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation."  29 C.F.R. § 1630.2(o)(3).  "The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated."  *Jackan v. N.Y.S. Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000) (quoting 29 C.F.R. § 1630.2(o)(3)).  "[T]he ADA places a duty on employers to ascertain whether there are some jobs that the employee might be qualified for."  *Felix v. N.Y.C. Transit Auth.*, 154 F. Supp. 2d 640, 655 (S.D.N.Y. 2001).

Defendant cites several inapposite cases in support of its argument that Plaintiff's request to be placed in a position at headquarters was unreasonable because a police department is not required to create a new desk position for a patrol officer.  For example, Defendant cites *Santos*

*v. Port Auth.*, No. 94-CV-8427, 1995 WL 431336 (S.D.N.Y. July 20, 1995), for the proposition that the reassignment of a police officer to a desk job is not a reasonable accommodation. (Def.'s Mem. 16.) Defendant fails to mention that *Santos* is a discrimination case, not a reasonable accommodation case, and that the question before the court was whether the plaintiff was a "qualified individual" to serve as a police officer, not whether the requested accommodation was reasonable. 1995 WL 431336, at *3.[3] In that context, the court in *Santos* concluded that plaintiff was not a "qualified person" because he admitted he could indefinitely only perform "light duty," and no permanent light duty positions existed in the police department. *Id.* Defendant also cites *Guardino v. Village of Scarsdale Police Dep*'t, 815 F. Supp. 2d 643 (S.D.N.Y. 2011), for the proposition that "a reasonable accommodation cannot mean elimination of any of the job's essential functions" and that "an individual is not qualified for his position if he is unable to come to work." (Def.'s Mem. 16–17.) But *Guardino*, like *Santos*, was a discrimination case and the court also focused on whether plaintiff was a "qualified person." *Guardino*, 815 F. Supp. 2d at 648. Defendant also cites *King v. Town of Wallkill*, 302 F. Supp. 2d 279, 291 (S.D.N.Y. 2004) (holding that the plaintiff's proposed accommodation of permanent light duty was not reasonable because "the record clearly demonstrate[d] that these positions [did] not exist in the [t]own's police department"), and *Feeley v. N.Y.C. Police Dep't*, No. 97-CV-2891, 2001 WL 34835239, at *9 (E.D.N.Y. Sept. 4, 2001) ("Were this [c]ourt to require [the] defendants to accommodate [the] plaintiff by permitting her to continue working on limited duty indefinitely, we would be asking them to eliminate the essential functions of a police officer."). (Def.'s Mem. 16.)

---

[3] The standards for ADA discrimination and ADA reasonable accommodation claims are different. *See McMillan*, 711 F.3d at 125–26. The Court discusses the standard applicable to ADA discrimination claims at greater length in *infra* Section II.B.2.b.

Unlike the plaintiffs in *Santos, Guardino, King,* and *Feeley*, Plaintiff does not allege he requested a permanent light duty assignment, or any light duty assignment at all—he merely requested that he be relocated to headquarters so that he could be closer to a bathroom. (Compl. ¶¶ 69–70.) This accommodation request was tied to the side effects of his cancer treatment, and the only timeline Plaintiff references is a three-year period during which he would need to receive "preventative maintenance" treatments. (*Id*. ¶ 29.) Moreover, Defendant notably does not expressly argue that Plaintiff is not qualified to be a police officer, or that after his cancer treatment is complete Plaintiff will not be able to return to patrol duty without an accommodation. Indeed, Plaintiff alleges that he is able to perform the *essential functions* of his previously assigned position of Police Detective and his current assignment to patrol, with or without an accommodation. (*Id*. ¶ 89.) Finally, and perhaps most notably, Defendant does not argue that there is no work that a Patrol Officer could do at headquarters on a temporary basis, or that there is not another position at headquarters for Plaintiff.

As pled, Plaintiff's request to be placed at headquarters for the duration of his cancer treatment is a plausible "accommodation, the costs of which, facially, do not clearly exceed its benefits." *Borkowski*, 63 F.3d at 139. *Compare McMillan*, 711 F.3d at 128 (holding that city employee's suggestion that he work through lunch and work late to "bank" time to apply against future late arrivals was a plausible accommodation for his disability of schizophrenia, which required him to take medication, thereby making him drowsy in the morning resulting in late arrival at work) *and Kane v. Carmel Cent. School Dist*., No. 12-CV-5429, 2014 WL 7389438, at *6 (S.D.N.Y. Dec. 15, 2014) (holding that high school orchestra director met her burden of identifying reasonable accommodation that would have enabled her to perform the essential functions of her job after she was diagnosed with multiple sclerosis by suggesting, inter alia, the

modification of a door and the provision of a raised podium) *with Hunt-Watts v. Nassau Health Care Corp.*, 43 F. Supp. 3d 119, 133–34 (E.D.N.Y. 2014) (holding that podiatrist whose job it was to perform surgeries did not identify a reasonable accommodation by suggesting the appointment of a nurse, having other podiatrists perform operations and surgeries, and allowing her to provide only consultation services, because the proposed accommodation eliminated one of her essential job functions, specifically, performing surgeries). Plaintiff did not ask to be exempted from any specific police officer task—he requested to be at headquarters near a bathroom.[4]

At this stage, Plaintiff has plausibly identified a facially plausible accommodation. Defendant raises no other bases warranting dismissal of Plaintiff's ADA reasonable accommodation claim. Accordingly, the Motion To Dismiss with respect Plaintiff's ADA reasonable accommodation claim is denied.

### 2. Disability Discrimination

Defendant argues that Plaintiff's disability discrimination claim based on his demotion is collaterally estopped because an independent state hearing officer recommended that he be demoted after a nine-day hearing. (Def.'s Mem. 17–18.) Defendant separately argues that

---

[4] Once Plaintiff has identified a facially reasonable accommodation, Defendant bears the burden of "persuading the factfinder that the [P]laintiff's proposed accommodation is unreasonable." *Borkowski*, 63 F.3d at 138. Additionally, because "the ADA places a duty on employers to ascertain whether there are some jobs that the employee might be qualified for," *Felix*, 154 F. Supp. 2d at 655, the factfinder will need to determine whether there was truly no other available position at headquarters that Plaintiff was qualified to perform—especially given that he spent several years of his career as a Detective at headquarters. At this stage, however, Defendant cannot introduce evidence that the proposed accommodation is unreasonable and imposes an undue hardship. Defendant thus cannot meet its burden based on the allegations in the Complaint, or any other materials that can be considered at this stage.

Plaintiff's disability discrimination claim should be dismissed because Plaintiff fails to identify a single similarly situated non-disabled comparator.  (*Id.* at 19.)[5]

### a.  Collateral Estoppel

Defendant argues that the New York State Hearing Officer's Findings of Fact and Penalty Recommendations dated May 19, 2017 preclude Plaintiff from raising his discrimination claims before this Court.  (Def.'s Mem. 17 (citing Miller Aff. C ("Disciplinary Findings").)  The disciplinary hearing addressed charges of misconduct against Plaintiff alleging that he was absent from work without authorization or proper notification to supervisors and failed to cooperate in the investigation of that absence.  (Disciplinary Findings 7, 12–13.)[6]

"The Full Faith and Credit Act, 28 U.S.C. § 1738, . . . requires the federal court to give the same preclusive effect to a state-court judgment as another court of that State would give." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005) (quotation marks omitted); *LaFleur v. Whitman*, 300 F.3d 256, 271 (2d Cir. 2002) ("A federal court must apply the

---

[5] Defendant does not, in the portion of its Memorandum arguing for dismissal of Plaintiff's ADA discrimination claims, mention Plaintiff's ADA discrimination claim with respect to his June 1, 2016 reassignment to patrol duty.  (Compl. ¶¶ 84–93.)  The Court, however, considers this claim along with the demotion claim.

[6] Plaintiff does not object to Defendant's citation to the State Hearing Officer's Findings, and indeed cites to the document himself.  (*See* Pl.'s Mem. 15–16.)  The Court is entitled to take notice of such public records in deciding a motion to dismiss under 12(b)(6).  *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998); *Medcalf v. Thompson Hine LLP*, 84 F. Supp. 3d 313, 321 (S.D.N.Y. 2015) (same); *see also Hason v. Office of Prof'l Med. Conduct*, 314 F. Supp. 2d 241, 246 (S.D.N.Y. 2004) (holding that court may consider state administrative decisions in ruling on a Rule 12(b)(6) motion).  However, in taking judicial notice of such public records, the Court does so only to establish "the fact of such litigation," not for the truth of the matters asserted in each proceeding.  *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006); *see also Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("If the court takes judicial notice, it does so in order to determine *what* statements [a document] contained—but *again not for the truth of the matters asserted*." (citation and quotation marks omitted)).

collateral estoppel rules of the state that rendered a prior judgment on the same issues currently before the court.").  In this case, New York is the relevant state as Defendants contend that a New York administrative hearing officer's judgment bar Plaintiff's discrimination and retaliation claims.  *See Colon v. Coughlin*, 58 F.3d 865, 869 n.2 (2d Cir. 1995) ("We . . . look to New York law to determine the effect of [the plaintiff]'s Article 78 proceeding.").  "Under New York law, collateral estoppel precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party . . . whether or not the tribunals or causes of action are the same." *LaFleur*, 300 F.3d at 271 (citation and quotation marks omitted).  "When it applies, collateral estoppel divests a federal district court of subject matter jurisdiction over the precluded issue." *Sank v. City Univ. of N.Y.*, No. 10-CV-4975, 2011 WL 5120668, at *3 (S.D.N.Y. Oct. 28, 2011).  New York courts apply the doctrine "if (1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Colon*, 58 F.3d at 869; *see also Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 94 (2d Cir. 2005) (same).  It must be "quite clear that these requirements have been satisfied, lest a party be precluded from obtaining at least one full hearing on his or her claim." *Colon*, 58 F.3d at 869 (quotation marks omitted).  Thus, "[t]he party asserting issue preclusion bears the burden of showing that the identical issue was previously decided, while the party against whom the doctrine is asserted bears the burden of showing the absence of a full and fair opportunity to litigate in the prior proceeding." *Id.*  However, "[t]he doctrine of collateral estoppel 'is grounded on concepts of fairness and should not be rigidly or mechanically applied.'" *LaFleur*, 300 F.3d at 271 (quoting *D'Arata v. N.Y. Cent. Mut. Fire Ins. Co.*, 564 N.E.2d 634, 636 (N.Y. 1990)).

As a result of this doctrine, plaintiffs have been precluded from relitigating discrimination claims in federal court where state courts have concluded that no probable cause existed to believe the plaintiffs were subjected to discrimination. *See Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 466–67 (1982) (holding that plaintiff was barred from litigating his discrimination claim in federal court because "the Appellate Division of the New York Supreme Court . . . issued a judgment affirming the decision" of the NYSDHR Appeals Board, which found that the plaintiff's termination was "not the product of the discrimination that he had alleged"); *Yu v. Knighted LLC*, No. 15-CV-9340, 2017 WL 666118, at *7 (S.D.N.Y. Feb. 16, 2017) (holding that the plaintiff was collaterally estopped from bringing discrimination and retaliation claims under Title VII and ADEA in federal court, where he previously brought employment discrimination claims in state court under state law because "the elements of a successful employment discrimination claim are identical under both federal and state law").

However, the Court is not aware of, and Defendant does not cite to, a case in which a plaintiff was collaterally estopped from bringing discrimination claims in federal court where the state courts, or a state hearing officer, never considered whether the plaintiff was discriminated against. Here, the state hearing officer considered specifically whether Plaintiff properly notified his supervisors of his July 28, 2016 absence, (Disciplinary Findings 7), whether he provided false information to justify that absence, (*id*. at 12), whether he was insubordinate during the August 10, 2016 disciplinary meeting, (*id*. at 2), and whether demotion was the appropriate penalty, (*id*. at 19). The hearing officer in no way considered whether discrimination played any role in any of the actions taken by Defendant with respect to Plaintiff. The elements of ADA and NYSHRL claims thus were not addressed. *See Garrido v. N.Y.C. Dep't of Edu.*, No. 16-CV-9464, 2018 WL 1664793, at *4–5 (S.D.N.Y Mar. 15, 2018) ("Here, [the] [p]laintiff's claims

under . . . [§] 1983 . . . and analogous provisions of the NY[S]HRL likely will hinge on whether [disability] . . . was a motivating factor in the [d]efendant's decision to terminate [him]. With respect to this inquiry, a finding by the state court that the decision to terminate was rational does not lead inexorably to the conclusion that [disability] was not a motivating factor in the [d]efendant's decision to terminate [him]." (citations, alterations, and quotation marks omitted)).

Because Plaintiff's discrimination claims were not considered by the state hearing officer, collateral estoppel does not preclude Plaintiff from making a discrimination challenge in the instant case.

b. Merits Analysis

Disability discrimination claims under the ADA and NYSHRL § 296 are analyzed under the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *McMillan*, 711 F.3d at 125. Under this test, the Plaintiff must first establish a prima facie case of discrimination under the ADA and NYSHRL § 296. To do so, a plaintiff must demonstrate that: "(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability or perceived disability." *Kinneary v. City of New York*, 601 F.3d 151, 155–56 (2d Cir. 2010).[7] "New York State disability discrimination claims are governed by the same legal

---

[7] If a plaintiff establishes a prima facie case of employment discrimination, the burden shifts to the defendant, who may rebut his claim with legitimate, non-discriminatory reasons for the adverse employment action. *See Sattar v. Johnson*, 129 F. Supp. 3d 123, 137 (S.D.N.Y. 2015), *aff'd sub nom Sattar v. U.S. Dep't of Homeland Sec.*, 669 F. App'x 1 (2d Cir. 2016). "The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254

standards as federal ADA claims." *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 117 n.1 (2d Cir. 2004); *see also* N.Y. Exec. Law § 296(2)(a) (making it unlawful for any "person, [including] the owner, . . . agent[,] or employee of any place of public accommodation" to discriminate on the basis of disability). The Court will thus analyze the Plaintiff's ADA and NYSHRL § 296 claims in tandem. *See Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 n.2 (2d Cir. 2010) ("We review discrimination claims brought under the NYSHRL according to the same standards that we apply to Title VII discrimination claims."); *Leopold v. Baccarat, Inc.*, 174 F.3d 261, 264 (2d Cir. 1999) ("Because New York courts require the same standard of proof for claims brought under the NY[S]HRL as for those brought under Title VII, [the Court will] analyze these claims in tandem."); *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 483 (N.D.N.Y. 2017) (analyzing ADA and NYSHRL claims in tandem).

Defendant does not dispute the first, second, or third elements of a disability discrimination claim in its Memorandum, but rather argues that Plaintiff's discrimination case is conclusory because Plaintiff fails to identify a "single nondisabled comparator who was allegedly treated differently than him." (Def.'s Mem. 19.)

---

(1981) (citation omitted). For example, "an employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately provide a legitimate, non-discriminatory reason for the employer's adverse action." *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001). If the defendant presents legitimate reasons for the employment action, the burden shifts back to the plaintiff to plausibly allege "the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination." *Sattar*, 129 F. Supp. 3d at 137 (citing *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004)).

However, because a plaintiff need not make out a prima facie case at the motion to dismiss stage, because the facts alleged in a plaintiff's complaint are assumed to be true, and because in adjudicating a Rule 12(b)(6) motion a district court must confine its consideration to facts stated on the face of the complaint, Defendant cannot at this stage introduce evidence of non-discriminatory reasons for their treatment and termination of Plaintiff's employment. The Parties do not address the subsequent steps of the *McDonnell* test in their Memoranda, and the Court does not consider those steps at this stage.

Absent direct evidence demonstrating discriminatory intent, "[a] plaintiff can raise an inference of discrimination by demonstrating the disparate treatment of similarly situated employees but 'must show [he] was similarly situated in all material respects to the individuals with whom [he] seeks to compare [him]self.'" *Kosack v. Entergy Enters., Inc.*, No. 14-CV-9605, 2019 WL 330870, *6–7 (S.D.N.Y. Jan. 25, 2019) (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)); *see also Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (holding that to establish disparate treatment, a plaintiff must allege that "[he] was similarly situated in all material respects to the individuals with whom [he] seeks to compare [him]self" (citation omitted)). "To be 'similarly situated,' the individuals with whom [a plaintiff] attempts to compare [him]self must be similarly situated in all material respects." *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997) (citation omitted). And to be similarly situated in "all material respects," Plaintiff must "show that similarly situated employees who went undisciplined engaged in comparable conduct." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000); *see also McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) ("[W]here a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to [the] plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination."); *Taylor v. Seamen's Soc'y for Children*, No. 12-CV-3713, 2013 WL 6633166, at *14 (S.D.N.Y. Dec. 17, 2013) ("What constitutes 'all material respects' varies, of course, from case to case, but 'the plaintiff and those [he] maintains were similarly situated must have been subject to the same workplace standards.' This requires 'a reasonably close resemblance of facts and circumstances.'" (alterations omitted) (quoting *Graham*, 230 F.3d at 40)). Moreover, although "[a]t the motion to dismiss stage, . . . evidence

[of similarly situated comparators] is not necessary[,] . . . a court still must determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated." *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 698 (S.D.N.Y. 2011); *see also Watson v. Geithner*, Nos. 09-CV-6624, 10-CV-3948, 10-CV-7282, 2013 WL 5420932, at *10 (S.D.N.Y. Sept. 27, 2013) ("Whether employees are similarly situated is ordinarily a question of fact; however, if there are many distinguishing factors between plaintiff and the comparators, the court may conclude as a matter of law that they are not similarly situated." (quotation marks omitted)).

Defendant cites a number of cases in which plaintiffs failed to identify non-disabled comparators. (*See* Def.'s Mem. 19 (citing *DePrima v. N.Y.C. Dep't of Educ.*, No. 12-CV-36296, 2014 WL 1155282, at *6 (E.D.N.Y. Mar. 20, 2014) (holding that plaintiff failed to identify any similarly situated comparators where she alleged that she was terminated for generating negative media coverage when "a vast majority of other tenured teachers" would not have been terminated for the same conduct); *Abel v. NYC Human Resources Admin.*, No. 10-CV-295, 2011 WL 812309, at *5 (S.D.N.Y. Mar. 3, 2011) (dismissing ADA claims where the plaintiff failed to identify any nondisabled comparators); *Fox v. State Univ. of New York*, 686 F. Supp. 2d 225, 230 (E.D.N.Y. 2010) (dismissing disability discrimination claim where plaintiff failed to name any similarly situated nondisabled comparators who were treated differently). In each of these cases, the plaintiff did not point to any one specific comparator and failed to offer or plead any additional facts showing such an individual was similarly situated to the plaintiff in "all material respects."

In the present case, Plaintiff alleges that other officers, including an unnamed Lieutenant of the Wappingers Falls Police Department, who were not disabled and did not engage in Union

advocacy, had been absent from work without authorization and were not brought up on disciplinary charges or demoted as a result. (Compl. ¶¶ 74–77.) Thus, unlike the plaintiffs in *DePrima, Abel,* and *Fox*, Plaintiff here does point to at least one particular non-disabled comparator. However, Plaintiff nonetheless fails to allege how or why a Lieutenant—an officer with a different job title—is similarly situated to a Detective or Patrol Officer. *See Robinson v. Am. Int'l Grp., Inc.*, No. 08-CV-1724, 2009 WL 3154312, at *4 (S.D.N.Y. Sept. 30, 2009) (holding that one of the reasons that proposed comparators were not appropriate was that they held job titles that were different from the plaintiff's job title). Plaintiff also fails to plead any other facts to plausibly allege that the Lieutenant or any other officer was similarly situated to him in "all material respects." For example, Plaintiff does not allege the reasons for the proposed comparators' unauthorized absences, whether they were subsequently able to offer a proper explanation or excuse for their absences, whether they were disciplined in some other way, and whether they had the same supervisors as Plaintiff. Plaintiff also does not name the Lieutenant. *Cf. Kunik v. N.Y.C. Dep't of Educ.*, No. 15-CV-9512, 2017 WL 4358764, at *9 (S.D.N.Y. 2017) (denying motion to dismiss where plaintiff identified comparators by name and alleged they were part of the same department at work); *Pothen v. Stony Brook Univ.*, 211 F. Supp. 3d 486, 495 (E.D.N.Y. 2016) (denying motion to dismiss where plaintiff identified one comparator by name and alleged he was subject to the same supervisor).[8] Plaintiff's Complaint

---

[8] The Court notes that elsewhere in his Complaint, Plaintiff alleges that Birdsell is a Lieutenant, (Compl. ¶ 24), but he does not allege that Birdsell is the similarly situated comparator. Plaintiff argues that discovery will show that there was only one Lieutenant in the Police Department. (Pl.'s Mem. 15 n.8.) It is unclear whether Plaintiff intended to allege that Birdsell is the only Lieutenant in the Department and also the comparator, but Plaintiff's Complaint does not state as much, and he provides no other identifying information about the comparator Lieutenant.

thus does not contain sufficient factual matter to plausibly identify a similarly situated comparator and to thereby raise an inference of discrimination.

Accordingly, Plaintiff's ADA and NYSHRL § 296 discrimination claims are dismissed.[9]

### III.  Conclusion

For the foregoing reasons, the Court grants Defendant's Motion To Dismiss with respect to Plaintiff's ADA and NYSHRL disability discrimination claims.  The Court denies Defendant's Motion with respect to Plaintiff's ADA reasonable accommodation claim and Plaintiff's First Amendment retaliation claim.  The claims that are dismissed are dismissed without prejudice as this is the first adjudication on Defendant's Motion to Dismiss.  *See Rennalls v. Alfredo*, No. 12-CV-5300, 2015 WL 5730332, at *5 n.6 (S.D.N.Y. Sept. 30, 2015) ("[The] Court will afford Plaintiff an opportunity to amend if, after reviewing this Order and Opinion and the law therein, he still believes that he can plausibly state claims against Defendant[].").  If Plaintiff wishes to file an Amended Complaint alleging additional facts and otherwise addressing the deficiencies identified above, Plaintiff must do so within 30 days of the date of this Opinion & Order.  Failure to do so will result in the dismissal of the dismissed claims with prejudice.

---

[9] Plaintiff fails to allege any facts whatsoever with respect to a similarly situated comparator for his discrimination claim based on his reassignment to patrol duty.  He fails to identify any non-disabled similarly situated comparators who were not transferred to patrol duty under similar circumstances.  In fact, Plaintiff alleges that on June 1, 2016, all three Detectives in the Detective Bureau were reassigned to patrol duty.  (Compl. ¶ 44.)  The Court thus concludes that Plaintiff fails to allege he was similarly situated to any comparator with respect to both the reassignment to patrol and the demotion claims.

The Clerk of Court is respectfully direct to terminate the pending Motion. (Dkt. No. 17.)

SO ORDERED.

Dated:      March 27, 2019
            White Plains, New York

                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE